Court of Appeals for the Federal Circuit is now open and in session. God save the United States Court of Appeals for the Federal Circuit is now open and in session. The case and the veterans benefits case, the latter two, are being submitted on the briefs and will not be authored. The first case we're going to hear is 2007-1114, NSK and American Veterans Benefits. The second case we're going to hear is 2007-1114, NSK and American Veterans Benefits. The other one is a rejection of our allocation of building adjustments in Japan. On the zeroing point, just a few basic points, although they've been well-developed in the briefs. This case is unlike prior cases which this court has dealt with that have discussed the zeroing, for the simple reason that this case, unlike the past ones, you actually, for the first time, have a decision, I'm sorry, an administrative proceeding before this court as to which the United States has said it will comply with the decision of the WTO. But the government's response, which I'm not sure you responded to in your brief, is that to the extent they're going to do anything by the end of the year, it relates to investigations and not to administrative reviews. That's what they're saying is not correct. And it's also irrelevant. It's not correct because the one as to which they will decide, they will implement by December 24th deadline deals with reviews. Investigations, implementation they already did. And they did that, they implemented that in February of 2007. But more to the point, the reason I said it's irrelevant is that in addition to kind of a general policy reconsideration by the Department of Commerce and the U.S. government, the U.S. also said it would comply as to 14 or 16 specific cases. This is one of those cases. So we're not talking about developing some general policy someday that will apply maybe to this case someday. And this court has considered that to be too speculative. We can't enforce the promise if you want to view it as a promise. I mean, if the, if all staff is very steamy, except for the executive, that's not what we did. And if they want to, if Commerce wanted the case back, to reconsider it in the light of the WTO decision or promise or whatever, they would have asked for it. They wouldn't have asked for it. It's true they didn't ask for it from this court. But nonetheless, we do think that the United States has announced to the world, we know that they've announced to the world that they plan to comply, they will comply as to this case. There's only one way that can be done. That can't be done any other way, any way, while the case is present in the judiciary. But how can we enforce their promise, which characterizes their promise in the course of the WTO? You don't have to enforce it, Your Honor. You simply have to give it back to them and let them decide how they're going to do what they say they're going to do. They say they're going to comply. Maybe when it's in front of them, they won't comply for political reasons or whatever. Maybe they will comply because, after all, they did make that promise. That's not for us. They haven't asked for a remand. They've not asked for a remand. They have not asked for a remand. But that alone should not be a reason for an issue that this Court has said is exclusively in the jurisdiction of the executive branch to be bottled up and affected in front of the judiciary. They've not asked for a remand, but nonetheless, we submit you should give it to them and let them decide how they will handle it. This is a hot political issue. It's not one that should, in effect, die in front of the judiciary. But rather, it should go back to the political branches and let them decide, especially because this Court has said, in the first court's case, that it's exclusively within the jurisdiction of the executive branch to handle it. Well, it's not going to die here. We're going to decide in this case. Right. Well, okay. What I meant by die is if you don't remand it, the executive will not have an opportunity to tell us what they're going to do next. We're talking about savings. Right. They could say it right here. They could say it today. They could stand up and say we want it back. That, Your Honor, is not the same thing as compliance. They told the WTO that by December 24th— That's what they want. They want it back and get it back. They don't want it back, they don't get it back. It's not our business. If that's your view, fine. But, I mean, I have nothing to say beyond the fact that they do— they have obviously not requested a remand. There's no question about that. But they have, at the same time, told the WTO that they're going to do something. And there's no way for them to even try to do that if they are not given the case back. Well, let me ask you. They say in their brief as to what they've said and when they've said it, they say, to date, Congress has stated only that it will not use zeroing in average-to-average comparisons in new and continuing investigations. Is that not correct? That's correct so far, yes. That is correct. But, again— So they haven't announced that they will— Of course not. That will happen on December 24th, according to the current schedule. And this case is one of those cases that's due for action by December 24th. They can't have done it yet because it's been in front of the judiciary for the past couple of years. Maybe they'll ask for it back on December 24th. By then, I suspect you may have decided that's the case. Maybe they would. Maybe they would. On December 24th, if it's possible, they would say— Sort of early Christmas? We would like it back. Right. Right. Mr. Ellis, speaking of zero, we are at zero now. In fact, we're at minus unless you want to— I am already— —reserve your rebuttal time. I will save my rebuttal time. And maybe then can I talk about the building adjustment issue as well, if we have time? No. Or is that— Only if there's rebuttal. Okay. I will reserve my time. And if we don't get the building adjustments, I will rest on my briefs on the issue. Thank you. Ms. McDonough. Good afternoon. When analyzing high-profit sales, commerce must examine merchandise sold for consumption in Japan in the usual commercial quantities in the ordinary course of trade. And high-profit sales must be compared to sales of merchandise of the same class or kind. That is, high-profit sales must be compared to sales of ball bearings sold for consumption in Japan in the usual commercial quantities in the ordinary course of trade. Commerce's remand decision has failed to analyze this. Why are they not in the ordinary course of business? The same. That's your position. Yes. They are because there are some certain characteristics of the sales that cause them to be outside the usual commercial quantities, the usual profit, the usual characteristics of other sales in the business. Ball bearings are highly engineered and technically— Isn't this a fact question in which we owe substantial deference to the agency? It is a question of fact, yes. And there is substantial deference. And this Court has made a decision on this similar issue that is settled with you in this case. However, we think that because it is a question of fact, it is clear that Commerce did not analyze NTN's evidence given the decisions of this Court and the decisions of the Court of International Trade since then. NTN has refined its methodology. It has provided examples of how it has refined its methodology over the years. And we believe Commerce did not adequately analyze this according to the statute and regulations. Well, you regularly sell small volumes, right? Yes. And those sales are a small fraction of the amount of business, right? Small volume sales? Yes. Well, yes, but they're— So how are they not part of the ordinary person's business? Well, NTN does sell small volume quantities, yes, in the ordinary person's business. In fact, Commerce stated that there are some hundreds of thousands of these sales in NTN's database for this review. But the point is, that's exactly what NTN is saying. We are not requesting that all sales of small quantities be excluded from the database. Only certain sales of small quantity, very high profit, in other circumstances, that when compared to normal course sales, are outside the ordinary course of trade. Well, the only thing that's abnormal about them is the high price, right, and high profit. No, that is Congress's conclusion, but we believe that that should be the starting point, given that— What else is unusual about them? Compared to the sales to different customers or the same customers, they are not in commercial quantities. Commercial quantities of these sales are generally hundreds of thousands of pieces. But a lot of your business is in small quantities, isn't it? Some of it's in small quantities, but they are generally for production runs. Those sales are continuous sales, monthly, even if it's a small quantity. The other sales are requested for testing, research and development, perhaps a replacement part. So what specifically is the difference between the ones you want excluded? The totality of the circumstances of these sales, including that MTN designated a very, very tiny percentage of its database as high quantity, aberrational, high profit sales, that they were requested for specific reasons, perhaps testing, replacement. They're outside the normal course of MTN's production runs. They are sold in generally very small quantities, and yes, that's true of other sales as well, but it's true of these sales. They are, by definition, aberrationally high profit sales. MTN has provided a comparison of sales in the market for ball bearings in Japan that shows the aberrational profits. And the market is... And by aberrational, you mean different than most others? By aberrational, we mean very high profit. MTN provided a comparison of several hundred sales in the same control number, which is what Congress uses to match the sales, that showed profit levels ranging... that showed a comparison of profit levels of high profit sales with the profit levels of normal course sales. You can see that in many cases, it was thousands of times higher. Yeah, because the problem is that's the only thing we can do about these sales, is that they are high profit. What else is unique about them? We believe... You haven't shown replacement parts sales or high profit sales, have you, for example? No, but that's not the question. The question is not whether MTN sells replacement parts to the aftermarket. It's whether, certainly given that MTN sells antifriction bearings to the replacement market, are any of these sales... So what you're asking Congress to do is to include some of the replacement sales in their calculation, but to exclude the ones that are high profit. Yes, because that is what the regulation in the statute... We are looking at the totality of the circumstances according to the dictates of the score. I'll reserve the rest of my time for rebuttal. Ms. Burke for the government. May it please the court. Congress's remand determination should be sustained. First, with respect to zeroing, there's been no change in the United States policy with respect to a zeroing practice in the United States. You don't want the case back. I'm sorry? You don't want the case back. We do not want the case back. What about this announcement that the government issued today, or the commitment of the White House to the government, what is that? The announcement is that the United States has stated that it intends to comply with its WTO obligations with respect to the adverse WTO report at issue. And it's very important to also note that the United States said that it will be carefully considering how to do so. So does that mean the door is still open? I mean, if we decide this case in the next two weeks, it's over. But if we sit on it until next February, maybe the result will be different. No, absolutely not. With respect to the entry that issued in this case, which dates to between 2002 and 2003, any implementation... Let's assume that there is a change in policy for administrative reviews. Any implementation with respect to any particular administrative review has to happen pursuant to the statute according to Section 129 of the URAA. And Section 129 limits its application to entries that are entered on or after the date of implementation. So there's no way that any change in policy could retroactively affect these entries. That's not quite the same thing as saying you're not going to change your policy retroactively. Are you representing that Commerce is not going to change its policy retroactively? I'm not representing anything about what Commerce intends to do on December 24th because I don't know the answer to that. What I mean to say is that if Commerce responds to the adverse WTO report by implementing a Section 129 determination, which is a statutorily prescribed way of implementing an adverse... Are there other sources of attention? Doesn't Commerce take the position that there are other possible statutory sections which might give it the order? No, I think the only thing that Commerce has ever said that's been entirely consistent on this is that like all changes in policy or methodology, Commerce can change its methodology and the court can either sustain it or not sustain it depending upon the reasonableness of the change. And that's all Commerce has ever said. But with respect to responding to this adverse WTO report, the only statutory means of making a change is pursuant to a 129 determination. If Commerce is going to apply the change- Is that Commerce's position or is that just your position? Is Commerce deciding that? Well, I don't think it's a matter of Commerce deciding it. Well, it's viewed as a statutory authority, isn't it? Is that an official position of Commerce that it can't act retroactively unless it acts under Section 129? Well, it is Commerce's position that when it is implementing an adverse WTO report, it has to- Commerce's position is that it would be acting unlawfully if it didn't act under 129. Well, it has two ways of implementing an adverse WTO report. It can do it through Section 129, which deals with a specific administrative review or investigation, or it can do it as a general matter through a Section 123 determination. Those would be only two- So you're not representing that Commerce couldn't rely on 123? Well, as a practical matter, a 123 determination doesn't really have any effect unless it's to any particular administrative review, unless it goes through a 129 determination. I don't understand. So are you saying that Commerce does not have the authority to apply this to whatever, the entries after such and such a date? Are you saying Commerce does not have the authority to apply it to a program? I'm saying that in its response to the adverse WTO report that Etienne and Koya have raised here, Commerce, with respect to any particular administrative reviews, Commerce was limited to a Section 129 determination, and that Section 129 determination couldn't possibly affect the entries in this case. What I'm not saying is that Commerce couldn't, for some other reason, decide to change its methodology in, for example, an ongoing administrative review, but this is not an ongoing administrative review. This review has been closed for years, and the zeroing methodology that Commerce used during this administrative review was lawful at the time, which this Court noted in the recent Court's decision. So does that mean that Commerce does not have the authority to apply it retroactively, or just therefore it wouldn't be wise and obviously Commerce would never want to do that? With respect to this administrative review, I don't see practically speaking how Commerce could reach back to these entries without requesting a remand. But Commerce doesn't decide that, right? Well, I mean, as a practical matter, although it hasn't explicitly decided it with respect, well, it hasn't requested a remand for these entries. What it has done in the 17th administrative review for anti-christian bearings, which is five years after the entry here, it has said, with respect to its comments in February of 2007, that it does not intend to change its zeroing policy with respect to the administrative review that was just completed. So there's no reason to expect that Commerce would consider changing it five years prior. But it could. It could if it wanted to. If Commerce determined that it had made an error, we could request a remand now, certainly. I'm not going to foreclose the possibility, but because Commerce can always request a remand if it has a reasonable reason, and the court can grant or deny that reason. But as I said, there's no reason to believe that Commerce would ever do that when in the administrative review that has just been completed, Commerce has specifically said it has absolutely no intention of changing its policy. How did it get to the Christmas Eve date? Is that because Commerce has said it's going to respond by the end of the year, or is there something that has to be required? Well, I believe that the parties to the WTO dispute, the United States and Japan, arrived at that date by agreement. I don't know why they did choose December 24th. It seems like a strange date to me, too. But the date is merely the date upon which the parties agreed that the compliance period would end. It's not the date on which any one particular thing is supposed to happen. I want to, unless there are other questions on this, I want to ask you some questions about the billing adjustments, because it seems to me that what Commerce has done is problematic. What you're really saying is that a record-keeping system, which was satisfactory at the time the electronic records were created, is no longer going to be satisfactory. And you're probably not familiar with the Princess Cruise Line case. It was for your benefit, and that was between 9th, 7th, or 13th, 58th. But that case suggests that where an agency acts retroactively by requiring records, which weren't required in the first place, that that change is not permissible. And it seems to me that there's a pretty good argument that that's what's happened here. You said, well, we're not going to allow your billing adjustments because we didn't keep electronic records, which weren't required at the time the electronic records were created. Well, respectfully, Your Honor, I don't think that that's at all what Commerce said. To the extent that Commerce raised that issue in its remand determination, it did so in a sort of lodging of an objection to the Court of International Trade's remand order. I don't see what your basis is for saying that. I read the decision. Why? It doesn't say that? Where is it saying that? Well, it doesn't specifically say that it's lodging an objection, but there's absolutely no— So what it said in the remand decision says we're going to require to keep these records retroactive? That's what it said? In its original decision, Commerce denied the negative billing adjustment because it caused distortions. But addressing my question, which is where does it say in here that this isn't its reasoning for non-billing adjustments, it seems to me pretty clear on the basis of the decision it's addressing the remand order and it's saying this is going to have a prophylactic effect in the future because it wants to be able to claim billing adjustments without keeping federal electronic records. And the problem with that is that they can't go back to the time of the matter when we create the electronic records. You're saying we're creating a new rule and applying it retroactively to a period when the records are going to be kept. Well, again, what Commerce is responding to in its first comments in the remand determination, which I think your Honor is referring to, it's responding to the Court's holding. Where does it say that? Well, on page 226 of the Joint Appendix, which is page 3 of the remand determination, Commerce is responding to COYO's allegation that the Department has misinterpreted the Court's remand order. And in response, what Commerce says is the Court did not order us to accept COYO's negative lump sum billing adjustments. The Court didn't indicate in its decision that it disagreed with our grounds for denying COYO's negative lump sum billing adjustments. Indeed, the Court cites to COYO's proposed remedy for a differential treatment. So with respect to the only thing that the Court remanded was the differential treatment aspect of it. In page 227 through 228, this is Commerce's decision on the remand. And it says we're going to require them to keep new records and we're going to call them for not keeping new records. Well, but in actual fact, that is not what Commerce did in this review. Well, I'm going to have to tell since the decision says that is what it's doing. But Commerce goes on to explain that with respect to the differential treatment aspect, it's essentially conceding issue. And it does not believe that, although it is lodging an objection, that it still believes, despite the Court of International Trade's decision, that it could have applied a differential treatment analysis. It is not going to apply that differential treatment analysis here because it's basically been fortified by the court. But it doesn't apply to the, sorry, at the end of the second, the first full paragraph of page 229, Commerce says we've denied both COYO's positive and negative lump sum billing adjustments. So it didn't apply the differential treatment. But it did fault them for not having the records. What is the basis for the decision if it's not the records? What's distorted about their, the record keeping? It's the same record keeping that Commerce had approved several times in the past, right? Well, no, not necessarily. But what happened in the past is that Commerce verified COYO's billing adjustment, all of COYO's records, and didn't come across the problem that it came across. What's the problem that it came across? The problem that it came across here was twofold. First, it noticed, based upon all of the sales that COYO gave it for this particular issue, it noticed that the billing adjustment allocation was allocated to non-subject merchandise and also allocated to sales outside the period of review in quite a large- That's what happened in the past. That's when you did that before we approved it. We specifically approved that. But we were challenged that an allocation between scope and non-scope periods wasn't appropriate. You said that you wanted to allocate it that way, that that was permissible to allocate that way. We sustained you. What's different now? Because as Commerce explained in its first Issues and Decision Memorandum, for the first time it directly observed clear evidence of the distortion. What's the clear evidence of distortion? The distortion is, without using actual numbers, on page 284, Commerce- and this is the memo to file with respect to this issue- Commerce noted that there was a very, very small percentage of sales that actually received an adjustment but allocated across many, many more sales that did not receive an adjustment. And the difference between what happened here and what happened in the previous reviews is that Commerce was able to see, just based upon the spot check that it did, that the facts of this case were substantially different than the facts of the- Explain that to me again. I didn't understand what you said. The difference between what happened at verification here versus what may have happened at previous verifications is that Commerce was able to see that the facts of this situation were substantially different. What's different about the facts? What's different about the facts is that Commerce was able to observe that the allocation methodology, which just as a side comment, an allocation methodology has to be demonstrated to the Secretary of Satisfaction each and every time it's made that it is not distorted. Are you proving that their allocation methodology in the past resustained? What's the difference between the allocation methodology that they're using now and the one they used in the past? I thought you agreed it was the same. Well, in the sense that they are allocating across all of their sales a billing adjustment, it is the same, but every year it's going to be different based upon the amount of non-subject merchandise. So what's the difference? The difference here is that, and again, on page 284 of the record, Commerce explains that a very, very small percentage of models are receiving an adjustment, and yet that adjustment is being allocated across a much, much larger number of models. What's distorted about that? Well, what's distorted about it with respect to a negative billing adjustment is that a negative billing adjustment brings the home market price down. What do you mean by that? What's distorted? Because it's bringing the home market price down. There's an allocation. Explain to me, what's the problem with the allocation? Why is it distorted? They take a billing adjustment. They say this billing adjustment concerns sales of 2,000 units. They divide it into 2,000 and they spread it over the 2,000 units, and they include the billing adjustments with respect to the 2,000 units that are in the period of review and that are within-scope merchandise. What's distorted about that? Because you are disproportionately lowering the price of sales that had absolutely no adjustment. Let's take easier numbers. Let's say there's one sale that gets a billing adjustment and 99 sales that don't. Why should all of those 99 sales have their normal value lowered because of the one sale? To step back, all allocations are per se— I don't understand your math. Give me an example of what's going on here that's distorted. Give me an example of real numbers, hypothetical numbers. Okay. If it's okay, I can—I guess my previous example wasn't that persuasive, but what I was trying to get across is that if you have one billing adjustment to one customer— Give it a dollar value. It's a billing adjustment of $1,000, okay? Okay. All right, and it involves a sale of 2,000 units. Okay, now what's—how did that get distorted? So in your hypothetical, that billing adjustment was actually given to 2,000 to—in one sale to over 2,000 units? They spread it over the 2,000 units, and then, as I understand the way they do the billing adjustments, they say, okay, well, to the extent that any of those 2,000 units are within the scope, we'll treat that as a billing adjustment that is relevant to the calculations. Well, I think what's missing from the hypothetical is a statement about how many of those sales actually received an adjustment because that will determine whether or not the allocation— Well, as an initial matter, COYO, although it doesn't keep its records this way, obviously knows who it's giving its adjustment to. I mean, the fact that it doesn't— That just sounds like a record-keeping problem. As most allocation issues are. Well, in other words, the problem is they didn't keep the right records. No, the problem is not that they didn't keep the right records. The problem is that they allocated it across too broad a category. What do you mean across? I don't understand. Well, let me— I mean, there's some merchandise within the scope, and there's some without the scope. That's what an allocation is. They're trying to allocate it so that, you know, some of the in-scope merchandise will bear part of the lump sum adjustment, and some of the rest of the merchandise will also bear it, but they'll only include the in-scope merchandise within the calculation. What's going on? I think it's helpful—Coyo realized pretty publicly upon this Court's decision in MTN as justification for its methodology, but I'd like to talk just a little bit about what the Court said in MTN. I've read it. I've read it. Okay. Tell me—unless you have a distorted sense of the answer, Judge, I think we've had a lot of time. Please give a specific answer. What's distorted is that it doesn't—and I'm going to use the language from MTN— it doesn't reasonably correlate to the sales of in-scope merchandise. If you have an allocation that— What does that mean? Of course there's in-scope and out-of-scope merchandise. That was the exact issue in our earlier decision. They're allocating the lump sum billing adjustment between in-scope and out-of-scope. Are you saying there's something wrong with that? No, I'm not saying that there's necessarily anything wrong with it, but depending on the extent to which out-of-scope merchandise gets the allocation or merchandise that extends beyond the period of review, COYO is responsible to—has the responsibility of demonstrating that the allocation is on as specific a basis as possible and not distorted. So I think Your Honor's hypothetical seems to be suggesting that all allocations are okay. I mean, no, the reason why the regulation specifically says that every respondent must— But what you're implying is why this allocation is not okay, and I don't understand, and maybe there isn't an answer to my question. Well, the best that I can say is that it was simply overly broad, and the numbers on page 284 bear that out. Thank you, Ms. Burke. We have a chance to discuss the issue. Thank you. We'll hear from Timpton. Mr. Preston. Thank you, Your Honor. Perhaps I can try to clarify what it is that the Commerce Department found with regard to COYO's billing adjustments. It's, of course, very true that Commerce has looked at these same billing adjustments many times and has submitted to the Court that that is one of the reasons why this is a factual issue where you should report deference to the experience of the Commerce Department. They've approved the methodology in the past, and now they apparently have changed. Right. If they change, they have to explain why they changed in a way that's understandable under the Supreme Court's decision in State Farm, under our decision. Correct. What's the difference? Correct. The Department has, the difference in this review is that the Department conducted a thorough verification of what billing adjustments actually, how they were reported and what billing adjustments COYO applied with its customers, and it apparently observed during verification that the billing adjustments were granted to, on particular models and not on certain other models, and then that they were granted for particular periods of time and not certain other periods of time. And they observed that, and of course they were then allocated across all the sales to a particular customer. Right. So what's wrong? What's wrong with that is if you observed a number of instances of such allocations and you could see that, well, generally the granting of the adjustment has nothing to do with the fact of whether a particular model is used for the normal value calculation. You know, sometimes they get the adjustment, sometimes they don't get the adjustment. So therefore, if we allocate across the customer, we can figure out the average that we have done a reasonable job allocating because sometimes the model gets the adjustment, sometimes it doesn't, sometimes the model gets used for NV, sometimes it does not. But what they apparently observed here was that the models that were not used for the normal value calculation were getting adjustments, and then these adjustments were then, and the models that were used for NV were not getting the adjustment in reality. And then the allocation basically took the adjustments that were given to the models that were not used for NV and the models that were outside the time period that was used, and put that all, allocated that all towards the models that were in fact used for NV. So in other words, the distortion lies in the fact that your assumption that you have, you know, every allocation is based on an assumption. The assumption is that the reality does not depart too far from the allocation and that things basically are, I won't say random, but at least evenly, that the apportionment, some of the court cases use the word reasonable apportionment, you know, so that there's sort of a similar incidence, that you have the adjustment falling on certain models pretty evenly and certain time periods pretty evenly. How is it different from what they were doing before? Well, the method, it's the observation that they did. You know, they observed. So it's not different from what they did before? Well, this is the first time that they, apparently to my knowledge, that they observed precisely what the difference was between the actual granting of the adjustment. The answer is there's no reason to believe it's different from what they did before, but you're saying they looked into it more than they did previously. Yes. Is that what you're saying? Yes. Okay, so when they looked into it, what did they find was the problem? That the apportionment was not reasonable because the incidence of the, just like I described, that there were allocations granted to products in reality, to products not used for normal value, and then that was apportioned to all the sales, including the ones that were used for normal value. And, you know, if they had, they did samples. I mean, they looked at certain sales. And apparently for each of the things that they looked at, it was the case that the actual sales that were used for normal value did not actually receive the adjustment. They just had it allocated from other sales that were not. That's what they've always done. That's what an allocation is. No, but if you. If it was some number and they allocated it between scope merchandise and other scope merchandise. Right, exactly. Well, it's not just scope and other scope. It's also, it's basically, it's also the particular models or the, you know, your assumption, your assumption is always that your allocation is approximate reality. You know it's different, but that approximate reality over time. And they looked at these particular samples. The samples that they built for their verification. And they saw for all the samples that they built for verification, that reality was in fact pretty different from the allocation. And therefore they said. How is it different from reality? How? That the sales that they, that were used for normal value in each instance did not actually receive an adjustment. When in fact one was allocated. That's the. I don't understand. I do not understand. Well, if you had, if you had two products. Yeah. And, and, and, and you sometimes grant an adjustment on one and sometimes on the other and vice versa. And it's pretty much random. Right. And then you sell these two products to a single customer. Right. Then you could say. Well, I'm going to allocate the adjustments that I, that I sold. These adjustments I'm going to allocate on a customer basis. I'm going to assume that product A and product A are pretty much the same. Right. And that would be a reasonable adjustment. Even though it's broader than, you know, sometimes the allocation would record an adjustment to a product that didn't get one. And sometimes it would not. But since you observed that the, the actual adjustment is given pretty much randomly. Sometimes to one product. Sometimes to another product. You would say it's okay. But then if you do a spot check. Say you take ten sales or you take seven sales. And you find that in fact it's not sometimes the adjustment to A and sometimes the adjustment to B. But you find that it's always to A. Thank you, Mr. Prest. We're running out of time. Thank you. And I think we're going to have to take time to put in positions. Thank you very much. Each council has a small amount of time. And I'll give you two minutes extra for questions if you need. Thank you very much. I'm quickly going to zero in. First, going to your date about why Christmas Eve. It's, the reason for that is it's ten months after the date that the United States agreed to comply with, announced its agreement to comply. And the United States and Japan agreed that ten months was a suitable amount of time to implement. There's one important point that the Department of Justice made that I do want to disagree with, which is that the implementation can only be prospective under Section 129. And therefore, it can't affect the entries covered by this review. That is not correct. The United States has told the world, as explained in our brief, that Section 129 is not the exclusive means of implementing. There are other methods, including, for example, in the course of administrative review. Or it said in WTO, the United States said, there could also be a court of agreement, which the judge, I'm sorry, which the department would then have to pursue. So there are, there's a quote, quote of the language in our brief. But the point is that there are methods by which the WTO decision in this case, applied to this review, could be implemented by the United States. A court-ordered remand? A remand that doesn't, you're not suggesting that a remand could then order them to comply? No. No, Your Honor, we would not. We would simply say, give the case back to them and permit them to do what the executive branch announced it was going, it is going to do. It is going to comply. It can't comply unless it gets the rest, if you will, the thing back. It can't comply while the case is in the judiciary. Or if the judiciary simply affirms, then the opportunity for the United States to do anything obviously evaporates. And frankly, I would submit that it's not an appropriate method for determining the outcome of a difficult political and foreign affairs issue like zeroing, for it simply to be affirmed and not give the executive the chance to do what it says it's going to do. On building adjustments, I just want to make one or two. Yeah, and on building adjustments, it's not your view as if the government didn't have the authority to do this, just because they've been approving this all along for the purposes of this case. They're free to say no. I understood your problem in the brief to be that you didn't think you had enough notice, whereas you do have an opportunity to resolve a formal remand, am I correct? I'm not sure you're entirely correct as to our position. Our position is that the department has a well-established methodology for determining whether an allocation over scope and non-scope merchandise is permissible, is unreasonably distorted, not just distorted, but unreasonably distorted. And that they've been applying steadily since they promulgated the regulations in 1987. It's in their Federal Register notice in which they announced this new policy, more liberal policy, after the enactment of URAA. They deviated from that without any explanation whatsoever in this case. They simply did not apply the same criteria to determine whether or not our allocation here was unreasonably distorted. How do you know that? They don't talk about it at all. It's silent. Well, they say that they did this then. And then they found distortions. This was the first time they had found these distortions. There was a difference over the time period itself. Okay. So if that's true, if they did find just some sort of distortions, then they can change their minds, right? They can change their methodology. The criteria by which they determine whether it's unreasonably distorted has been, are the products over which the allocation occurs similar or alike one another in terms of the price, the uses for which they're put, and the channels of distribution. And every year in the past, they have considered those criteria in which they dealt with this issue. This time, silence. They don't talk about those issues at all. Instead, what they simply do is what Judge Dyke was discussing, which is that they simply notice that there's an allocation in effect, that the allocation is over a broader universe of sales. Well, that should be the start of the inquiry, not the end of the inquiry. Yes, of course, there's allocation over a broader universe of sales. So what do they do wrong? You're not suggesting that they have to continue use of the methodology. What is the problem? What do they do wrong? They have to explain, pursuant to a lot of precedence by this Court and the Supreme Court, they have to explain why it is that they are no longer using the criteria of the products over which the allocation is occurring are alike in terms of uses, value, and channels of distribution. That is the established methodology by which you determine the unreasonably distortiveness of an allocation. Or they could explain that they don't think those criteria are the right criteria. So they could change the criteria. Correct. They can change the criteria. They're not locked in forever in those criteria. They can change the criteria. But they can't simply… I'm sorry. The problem is they didn't change the criteria. Right. Correct, Your Honor. They continue… Those criteria are still there. For some reason, this verifier got concerned about the fact that there was an allocation of a broader universe of products. And just to address one last point, the problem is you don't even have the evidence on the record to know if this allocation is distorted or not, despite what the Governing Council says. The piece of paper they rely on, the exhibit, page 262, this is basically the only page they rely on, because it's the only one that shows the actual allocation had a number crunch in it. It doesn't show the full universe of sales, of models over which the allocation occurred. They didn't get that information because they weren't even looking at that question. So even if you want to say they have new criteria, and let's start over again, I submit you'd still have to remand to see how it applied in real life in this case, because the record evidence doesn't support the determination that it's unreasonable, that it's distorted at all. Thank you, Mr. Roberts. Thank you. Thank you. In this Court's decision in the NTN case, in the seventh review of this case, the Court stated that two factors determining whether sales are in the ordinary course of trade are the percentage of sales with average profits and the nature of these sales. So building upon this, and given the factors of the sales of anti-friction bearings in Japan, sold to customer specifications, sold to exactly engineering standards, must be thoroughly tested and analyzed before being used, and the fact that there's no market for off-quality bearings, if a bearing is defective in any part of the specification, it's generally sold for scrap. Given this, the factors that NTN provided, given the nature of the sales and the very, very tiny percentage of sales that we've designated as abnormally high-profit sales, we contend that Commerce did not effectively analyze our data. Commerce stated that its conclusion, given NTN's exhibits, was that NTN's high-profit sales had higher profit than other sales. But, again, that is the starting point. We contend that they did not look at the totality of the circumstances, including the reasons for the bearing's sale. Are you responding to the rebutting argument, or are you reiterating what you've already stated before? Well, no one at the other site did not discuss this, so... There's nothing to rebut on that part. Okay. I'm sorry. I thought you were giving me the opportunity. Thank you. Only rebut. Thank you very much, Kate, for giving us your rebuttal. Thank you. The next case is Metkin v. United States, 2007-1138. Mr. Davis. Mr. Davis. We have a nickel copy. Good afternoon, Your Honors. I have a statement to say that we are prepared at least for the morning session. Yeah.